UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIFFINEY CLEAVES-MOORE and
TAMIKA NICHOLSON,

　　　　　Plaintiffs,

　　　v.　　　　　　　　　　　　　　　　Case No. 26-C-131

KIA AMERICA, INC.,
HYUNDAI AMERICA TECHNICAL CENTER, INC.,
KIA CORPORATION, and
FICTITIOUS DEFENDANTS A–C,

　　　　　Defendants.

## DECISION AND ORDER

Plaintiffs Tiffiney Cleaves-Moore and Tamika Nicholson brought this action against Defendants Kia America, Inc., Hyundai America Technical Center, Inc. (HATCI), Kia Corporation, and three fictitious defendants in Milwaukee County Circuit Court. Plaintiffs assert that Defendants are liable for the injuries Plaintiffs sustained in two separate motor vehicle accidents involving stolen Kia-brand vehicles driven by third parties. They contend that, by not equipping the stolen Kia vehicles with basic anti-theft technology, Defendants made the vehicles easier for criminals to steal and drive recklessly, causing traffic collisions. Plaintiffs assert claims of design defect in violation of Wis. Stat. § 895.047 and negligence under Wisconsin law.

On January 27, 2026, Kia America removed the action to this court, asserting diversity jurisdiction under 28 U.S.C. § 1332. Kia America subsequently filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). HATCI also filed a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2)

or, alternatively, for failure to state a claim. For the following reasons, HATCI's motion will be granted and Kia America's motion will be denied.

**ALLEGATIONS OF COMPLAINT**

In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (the Safety Act) to empower the federal government to set and administer new safety standards for motor vehicles and road traffic safety. Compl. ¶ 16, Dkt. No. 1-1. The Safety Act created the U.S. Department of Transportation and various subsidiary administrative agencies, including the National Highway Traffic Safety Administration (NHTSA). *Id.* ¶ 17. The NHTSA issues Federal Motor Vehicle Safety Standards (FMVSS). *Id.* ¶ 18. FMVSS 114 decreed minimum theft-protection standards that virtually all passenger vehicles in the United States must follow. *Id.* ¶ 19; *see* 49 C.F.R. § 571.114.

Kia America was incorporated in 1992 as the American sales, marketing, and distribution arm of its parent corporation, Kia Corporate, the Korean-based auto manufacturer. Compl. ¶ 36. Hyundai is Kia Corporation's majority shareholder. *Id.* ¶¶ 37–38. Kia America began manufacturing vehicles in the United States in 2010 at a manufacturing facility in West Point, Georgia. *Id.* ¶ 39. It manufactures several of the company's most popular models, including the Kia Optima, Sorento, and Telluride, at the facility. *Id.* Plaintiffs contend that HATCI is the design, engineering, and development center for all Kia and Hyundai vehicles sold in the North American market. *Id.* ¶ 40. Because HATCI serves as the technical arm of Kia Corporate and Hyundai's Korean-based parent corporation, virtually all Kia and Hyundai vehicles sold in the United States feature the same or similar design elements throughout their respective product lines. *Id.* ¶ 41. HATCI serves as an "authorized representative" of both Kia Corporate and Hyundai in North America to ensure these manufacturers' compliance with the Safety Act. *Id.* ¶ 42. In this capacity,

2

HATCI regularly interacts with NHTSA to ensure compliance with the administration's regulatory mandates. *Id.* Plaintiff alleges, on information and belief, that Kia Corporate and Kia America, in conjunction with HATCI and one or more of the fictitious defendants, are responsible for the manufacture, design, distribution, service, and repair of Kia vehicles that are sold to American customers. *Id.* ¶ 45. Plaintiffs contend that Kias and Hyundais manufactured between 2011 and 2021 share the following design flaws that made the vehicles easy to steal and created the auto-theft epidemic:

a. The Affected Vehicles are not equipped with a car alarm that has sensors to set off the alarm when one or more of the windows are broken, which permits a thief to crawl inside the vehicle without alerting those nearby;

b. The Affected Vehicles are not equipped with an "immobilizer" that prevents a given vehicle from starting without a code transmitted from the vehicle's specific key, so as to restrict "forward mobility" as contemplated under FMVSS 114;

c. The Affected Vehicles are not equipped with a hardened collar around the steering column, which is designed to inhibit easy access to the ignition lock cylinder;

d. The Affected Vehicles are equipped with a defective ignition lock assembly that allows a thief to easily bypass the lock cylinder by clicking a button, thereby providing easy access to the ignition switch to activate the vehicle with a screwdriver and/or pair of pliers; and

e. The Affected Vehicles are equipped with a defective steering wheel lock that disengages once the lock cylinder is bypassed and the ignition switch is activated to start the car, thus failing to restrict movement of the vehicle as contemplated under FMVSS 114.

*Id.* ¶ 50. The combination of design flaws (the Defect) made many Kias and Hyundais the preferred choice for Milwaukee's auto thieves, including the "Kia Boyz," which wreaked havoc on the Milwaukee Metropolitan area for years, beginning in the fall of 2020. *Id.* ¶ 51. Even though Defendants had actual and/or constructive knowledge regarding how the vehicles were being stolen, they continued to manufacture and sell the Affected Vehicles, thereby flooding the market

3

with more unsafe cars ripe for auto-theft, two of which were involved in the collisions that severely injured Plaintiffs. *Id.* ¶¶ 167, 170.

On December 29, 2022, Milwaukee Police Department officers responded to a call that a 2016 Kia Optima had been stolen from a parking lot at 7515 West Lisbon Avenue in Milwaukee. *Id.* ¶¶ 193–94. That same day, Nicholson was driving her 2021 Toyota Corolla eastbound on West Fond du Lac Avenue approaching the Baldwin Street intersection. *Id.* ¶ 203. The stolen Kia Optima entered the Baldwin Street intersection without stopping at the stop sign on West Baldwin Street. *Id.* ¶ 208. The Kia Optima collided with Nicholson's vehicle, causing her vehicle to spin out. *Id.* The Kia Optima fled the scene of the collision. *Id.* ¶ 210. Nicholson's vehicle was disabled and she was transferred to the hospital for treatment of her injuries. *Id.* ¶ 211. Her leg, neck, back, and chest injuries have required extensive treatment, including surgical intervention, consistent physical therapy, and frequent pain management appointments. *Id.* ¶ 212.

Less than a month later, on January 22, 2023, around 3:30 p.m., Milwaukee Police Department officers responded to a call that a 2021 Kia Sportage rental vehicle had been stolen from a parking lot at 346 North Broadway in Milwaukee. *Id.* ¶¶ 171–72. Later that day, around 5:10 p.m., police learned that a group of teenage boys used the stolen Kia Sportage to rob a citizen at gunpoint. *Id.* ¶ 178. Around 7:20 p.m. that day, a different Milwaukee Police Department officer, who was in a marked squad car, spotted the stolen Kia Sportage and attempted to stop the vehicle by activating the squad car's lights and siren. *Id.* ¶ 179. The Kia Sportage fled from the officer and made its way to a controlled four-way intersection at West North Avenue and North 20th Street. *Id.* ¶¶ 179–80.

Cleaves-Moore was driving her 2016 Audi Q5, which was stopped at a red light on North 20th Street at the North Avenue intersection. *Id.* ¶ 181. When the light turned green, she proceeded

into the intersection. *Id.* The Kia Sportage ran the red light and collided with Cleaves-Moore's vehicle, t-boning and disabling the vehicle. *Id.* ¶ 183. The passenger in Cleaves-Moore's vehicle, her longtime family friend, was killed on impact. *Id.* ¶ 186. Cleaves-Moore was transferred to the hospital to treat her injuries. *Id.* ¶ 185. Her back, shoulder, chest, and neck injuries have required significant treatment, including surgical intervention, and she has experienced significant emotional distress. *Id.* ¶ 186. Plaintiffs assert claims of design defect in violation of Wis. Stat. § 895.047 and negligence under Wisconsin law against Defendants.

**LEGAL STANDARD**

**A. Federal Rule of Civil Procedure 12(b)(2)**

Rule 12(b)(2) of the Federal Rules of Civil Procedure governs motions to dismiss for lack of personal jurisdiction. "The plaintiff need not include facts alleging personal jurisdiction in the complaint, but 'once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (quoting *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). "When the district court bases its determination solely on written materials and not an evidentiary hearing, plaintiffs must only make a prima facie showing of personal jurisdiction over the defendants to survive a motion to dismiss." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019).

In deciding whether personal jurisdiction exists, the court may rely on the complaint, affidavits, deposition testimony, exhibits, or other evidence in the record. *See Purdue*, 338 F.3d at 782. Any well-pleaded facts alleged in the complaint are accepted as true and any factual disputes in the affidavits are resolved in the plaintiff's favor. *Tamburo v. Dworkin*, 601 F.3d 693,

5

700 (7th Cir. 2010) (citing *Purdue*, 338 F.3d at 782). Where the defendant submits affidavits or other evidence in opposition to the exercise of jurisdiction, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. "If the plaintiff fails to refute a fact contained in the defendant's affidavit, that fact is accepted as true." *Mold-A-Rama Inc. v. Collector-Concierge-Int'l*, 451 F. Supp. 3d 881, 884 (N.D. Ill. 2020) (citing *Purdue*, 338 F.3d at 783).

**B. Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Rule 8 mandates that a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that a complaint must contain factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, it must plead "more than labels and conclusions." *Id.* A simple, "formulaic recitation of the elements of a cause of action will not do." *Id.* In evaluating a motion to dismiss, the court must view the plaintiff's factual allegations and any inferences reasonably drawn from them in a light most favorable to the plaintiff. *Yasak v. Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi.*, 357 F.3d 677, 678 (7th Cir. 2004).

ANALYSIS

**A. HATCI's Motion to Dismiss**

HATCI argues that this court lacks personal jurisdiction over it. "A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue*, 338 F.3d at 779 (citation omitted). Under Wisconsin law,

6

a court must employ a two-step inquiry to determine whether personal jurisdiction may be exercised over a nonresident defendant. The court first determines whether the defendant meets any of the criteria for personal jurisdiction under Wisconsin's long-arm statute, Wis. Stat. § 801.05. *Kopke v. A. Hartrodt, S.R.L.*, 2001 WI 99, ¶ 8, 245 Wis. 2d 396, 629 N.W.2d 662. If not, the court does not have jurisdiction, and the inquiry ends there. But if the statutory requirements are satisfied, the court then considers whether the exercise of jurisdiction comports with the requirements of due process. *Id.* The plaintiff bears the "minimal burden of establishing a prima facie threshold showing" that the statutory and constitutional requirements are satisfied. *Id.* (citation omitted).

Plaintiffs assert that HATCI is subject to jurisdiction under § 801.05(4)(b) of Wisconsin's long-arm statute. That section provides, "In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, . . . [p]roducts, materials or things processed, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of trade." Plaintiffs argue that the products HATCI processed, serviced, or manufactured were being used or consumed in Wisconsin; that HATCI designed, engineered, and developed Kia and Hyundai vehicles sold in North America; and that HATCI was involved in their manufacture, distribution, service, and repair. Compl. ¶¶ 40–45. They allege that HATCI provided design instructions for how the Kias are to be manufactured and comply with the Safety Act and that HATCI was part of Kias' processing by being involved in the design of the ignition assemblies of the vehicles, which was necessary for preparing the ignition assemblies used for the vehicles sold in Wisconsin. *Id.* ¶ 44.

7

But providing engineering or design services to Kia America is not processing, servicing, or manufacturing the automobiles that Kia America sells in Wisconsin. HATCI has submitted a declaration from its Director of Vehicle Regulation, Certification, and Compliance Department, Richard Willard. Dkt. No. 10-1. Willard states that HATCI is incorporated and headquartered in Michigan and has additional facilities in California. *Id.* ¶¶ 7–8. He notes that HATCI is a subsidiary of Hyundai Motor Company (HMC) and provides certain design, engineering, research, testing, and certification services to HMC and its affiliates. *Id.* ¶ 5. Willard asserts that HATCI does not manufacture, distribute, market, or sell any vehicles, parts, or components. *Id.* ¶ 6. He states that HATCI provides its services solely out of Michigan, California, Georgia, and Alabama to HMC affiliates that are not based in Wisconsin. *Id.* ¶ 16. Willard continues that HATCI is not licensed or registered to do business in Wisconsin, does not conduct business in Wisconsin, is not a party to any contracts in Wisconsin, does not own any real or personal property in Wisconsin, does not have an office or any employees in Wisconsin, does not have an agent for service of process in Wisconsin, does not pay taxes in Wisconsin, does not render its services in Wisconsin, does not advertise or otherwise solicit business in Wisconsin, and does not target Wisconsin through its services. *Id.* ¶¶ 9–15, 17.

Willard asserts that HATCI is independent of both Kia America and Kia Corporation. *Id.* ¶ 25. He states that neither Kia America nor Kia Corporation controls HATCI's operations, and HATCI does not control theirs. *Id.* Willard maintains that HATCI had no involvement with the vehicles involved in the incidents giving rise to this litigation. *Id.* ¶ 26. He contends that HATCI is not involved in selecting any Wisconsin business entities to serve as Kia dealers in Wisconsin and is not a signatory to any Dealer Sales and Service Agreements or any other contracts with auto dealerships or to any roadside assistance, service/maintenance, certified pre-owned, term

protection, 60 months/unlimited miles coverage, or extended-warranty contracts in Wisconsin or elsewhere. *Id.* ¶¶ 18–19. He maintains that HATCI has no involvement in granting or denying a Wisconsin dealership's request for allocation or distribution of Kia vehicles or products; does not provide or otherwise advise on any sales promotion assistance or training, sales promotion materials, sales and service campaign materials, advertising materials, or technical information to Wisconsin dealerships; and does not have any contacts with Wisconsin dealerships. *Id.* ¶¶ 20–22. Willard asserts that HATCI does not send personnel to Wisconsin Kia dealerships to advise upon theft-related issues. *Id.* ¶ 22.

Plaintiffs argue that their allegation that the products HATCI processed, serviced, or manufactured were being used or consumed in Wisconsin must be accepted as true for determining whether Plaintiffs made out a prima facie case for personal jurisdiction. Dkt. No. 13 at 28–29. The Seventh Circuit has held, however, that "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783–84. Where, as here, the defendant submits "evidence opposing the district court's exercise of personal jurisdiction, the plaintiff must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). "If the plaintiff fails to refute a fact contained in the defendant's affidavit, that fact is accepted as true." *Mold-A-Rama Inc.*, 451 F. Supp. 3d at 884 (citing *Purdue*, 338 F.3d at 783). While a plaintiff is "entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor," Plaintiffs have not submitted any affidavits or other supporting material to support their assertion that HATCI processed, serviced, or manufactured the products being used or consumed in Wisconsin. *See Purdue*, 338 F.3d at 783. Accordingly, for the purpose of determining whether

9

the court may exercise personal jurisdiction over HATCI, the court considers Willard's declaration as unrebutted by Plaintiffs and accepts the facts contained in the declaration as true.

Plaintiffs have not made a prima facie showing that HATCI processed, serviced, or manufactured products that were used or consumed in Wisconsin. Although Plaintiffs assert that HATCI was involved in the manufacture and service of Kia vehicles, Willard's unrebutted declaration states that HATCI does not "manufacture, distribute, market, or sell any vehicles, parts, or components." Dkt. No. 10-1, ¶ 5. Plaintiffs also allege that HATCI was involved in the Kias' processing, which includes such activities as packaging and preparing a product for market. Dkt. No. 13 at 29. But HATCI does not prepare a product for market; it only provides certain "design, engineering, research, testing, and certification services to HMC and its affiliates." Dkt. No. 10-1, ¶ 6. The court concludes that it does not have personal jurisdiction over HATCI under Wis. Stat. § 801.05(4)(b). Because Plaintiffs have not identified any other contact HATCI had with Wisconsin that could satisfy the long-arm statute, HATCI will be dismissed from this action for lack of personal jurisdiction.

Plaintiffs argue, "[a]t the very least," that they should be permitted to conduct jurisdictional discovery. Dkt. No. 13 at 36. "At a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction *before* discovery should be permitted." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (emphasis added). Plaintiffs have failed to make such a showing here. Therefore, Plaintiffs' request to conduct jurisdictional discovery is denied.

## B. Kia America's Motion to Dismiss

Plaintiffs allege that Kia America knowingly designed and sold vehicles with a defect that made the vehicles uniquely vulnerable to theft. They assert claims of design defect in violation of

Wis. Stat. § 895.047 and negligence under Wisconsin law. To state a product liability claim for design defect, a complaint must allege (1) the product is defective in design; (2) the defective condition of the product rendered it unreasonably dangerous to persons or property; (3) the defective condition existed at the time the product left the control of the manufacturer; (4) the product reached the user or consumer without substantial change in the condition in which it was sold; and (5) the defective condition was a cause of the claimant's damages. *Murphy v. Columbus McKinnon Corp.*, 2022 WI 109, ¶ 30, 405 Wis. 2d 157, 982 N.W.2d 898 (citing Wis. Stat. § 895.047(1)(a)). To state a claim for negligence, the complaint must allege "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach]." *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 717 N.W.2d 17 (quoting *Gritzner v. Michael R.*, 2000 WI 68, ¶ 23, 235 Wis. 2d 781, 611 N.W.2d 906). Kia America does not argue that Plaintiffs' complaint fails to allege these elements. Instead, Kia America argues that Wisconsin public policy precludes liability in this action. It asserts that public policy precludes holding a defendant that allegedly makes a car too easy to steal liable for injury and damage caused by the reckless driving of a car thief.

Under Wisconsin law, even if a plaintiff is able to establish the elements of a negligence claim, a court may limit liability for public policy reasons. *Gritzner*, 235 Wis. 2d 781, ¶ 26 (citations omitted). Although the public policy analysis originated in negligence law, it also applies to strict product-liability claims. *See Ransome v. Wis. Elec. Power Co.*, 87 Wis. 2d 605, 625–26, 275 N.W.2d 641 (1979). Wisconsin courts have identified six factors that may operate to preclude liability:

> (1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the tortfeasors' culpability; (3) in retrospect it appears too highly

extraordinary that the negligence should have resulted in the harm; (4) allowing recovery would place too unreasonable a burden on the tortfeasor; (5) allowing recovery would be too likely to open the way for fraudulent claims; [or] (6) allowing recovery would enter a field that has no sensible or just stopping point.

*Gritzner*, 235 Wis. 2d 781, ¶ 27 (citation omitted). "Because these factors are set out in the disjunctive, a finding that one is satisfied is sufficient to preclude liability." *Webber v. Armslist LLC*, 70 F.4th 945, 958 (7th Cir. 2023) (citation omitted). "[W]hen a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause-in-fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery." *Fandrey ex rel. Connell v. Am. Family Mut. Ins. Co.*, 2004 WI 62, ¶ 13, 272 Wis. 2d 46, 680 N.W.2d 345.

The question of whether public policy would preclude liability under the circumstances of this case is a question of Wisconsin law. "When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the supreme court would act given the chance, unless "there is a convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). And absent "any authority from the relevant state courts, [the federal court] . . . shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

Kia America asserts that public policy forecloses an auto distributor's liability for Plaintiffs' injuries caused by a thief's reckless driving of a stolen vehicle because imposing such liability would place an unreasonable burden on defendants and extend tort liability too far. In support of its argument, Kia America relies heavily on several cases in which thieves stole a car

12

from the allegedly negligent owners. In *Meihost v. Meihost*, 29 Wis. 2d 537, 139 N.W.2d 116 (1966), for example, the plaintiffs brought an action against a vehicle owner and his insurer for personal injuries sustained in a collision caused by the negligent driving of a thief of the owner's vehicle. The owner of the vehicle had left the vehicle unlocked with the key in a Band-Aid box in the glove compartment. *Id.* at 538–39. The Wisconsin Supreme Court held that the vehicle owner was not liable to the plaintiffs for their injuries because he could not reasonably have anticipated the theft of the vehicle and the plaintiffs' resultant harm. *Id.* at 546. The court went on to state, however, that, even if the keys had been left in the ignition, as a matter of public policy, there would have been no liability. *Id.* "Under most circumstances," the court explained, "allowance of recovery would place too unreasonable a burden upon the owners (or others having legal custody) of motor vehicles." *Id.* The court reasoned that "it would be incongruous to hold the car owner responsible for the negligence of the driver where the car was taken without permission while ordinarily exonerating him for similar acts where he has actually loaned his vehicle to the one driving." *Id.*

Similarly, in *Lichter v. Fritsch*, 77 Wis. 2d 178, 252 N.W.2d 360 (1977), the owner of a stolen vehicle had left the vehicle in a roadway, unlocked and with the key in the ignition, near a mental health facility. One of the patients stole the vehicle and then collided with a vehicle driven by the plaintiff. The complaint asserted a negligence claim against the owner of the vehicle, alleging that he "knew, or should have known, that leaving said vehicle in such circumstances posed an unreasonable risk that said vehicle would be stolen by one of the mental patients . . . ." *Id.* at 179. The court, relying on *Meihost*, concluded that, even if the vehicle owner was deemed negligent for leaving his keys in the ignition of an unlocked car, public policy considerations absolved the vehicle owner of liability. *Id.* at 182; *see also Dodge v. Stine*, 739 F.2d 1279, 1281

(7th Cir. 1984) (noting that Wisconsin law does not permit the imposition of liability upon a car owner who negligently allows his car to be stolen by a thief who later causes an accident).

Application of the public policy considerations in this case, however, differs significantly from the application of those considerations in *Meihost* and *Lichter*. In *Meihost*, the court concluded that holding an individual automobile owner liable for injuries caused by a car thief who recklessly crashed the car into an innocent driver because he left a spare ignition key in the glove compartment would place an unreasonable burden on the owner. 29 Wis. 2d at 546. The court reached essentially the same conclusion in *Lichter*. 77 Wis. 2d at 182. In this case, the defendants are an automobile designer and manufacturer that are responsible for vehicles that are sold throughout the country, not an individual owner responsible only for his own vehicle. The alleged defect is a built-in condition of the vehicle, as opposed to a single incident of at most absent mindedness or poor judgment at a unique time and place. An individual may reasonably believe that leaving his key in the car for a brief moment or in a safe neighborhood would not endanger others. Holding such a person responsible for the damage caused by a thief who steals the car under those circumstances, the *Meihost* court held, "would place too unreasonable a burden upon the owners (or others having legal custody) of motor vehicles." 29 Wis. 2d at 546. But the manufacturer of a motor vehicle knows that the vehicles it designs, manufactures, and sells will be parked in all kinds of neighborhoods for indefinite lengths of time.

RESTATEMENT (SECOND) OF TORTS § 449, Tortious or Criminal Acts the Probability of Which Makes Actor's Conduct Negligent, speaks directly to this situation:

> If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

14

The Wisconsin Supreme Court adopted this section of the Restatement in *Schneider Fuel & Supply Co. v. Thomas H. Bentley & Son, Inc.*, 26 Wis. 2d 549, 554, 133 N.W.2d 254 (1965). In that case, the plaintiff landowner sued the general contractor on a construction project for damages to the plaintiff's property caused by concrete debris and construction equipment that were dropped, hurled or otherwise projected onto the plaintiff's property. The plaintiff alleged that the defendant contractor was negligent in failing to erect a barricade or to guard the site to prevent vandals from causing such damage. *Id.* at 550–51. In granting the plaintiff landowner leave to amend its complaint on remand, the court held:

> If the effects of the [defendant's] negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

*Id.* at 554 (quoting *Merlino v. Mut. Serv. Cas. Ins. Co.*, 23 Wis. 2d 571, 579, 127 N.W.2d 741 (1964)).

Of course, this does not mean that public policy considerations cannot preclude liability. But the cases in which a causally negligent tort-feasor has been relieved of liability because of public policy considerations "are infrequent and present unusual and extreme considerations." *Stewart v. Wulf*, 85 Wis. 2d 461, 479, 271 N.W.2d 79 (1978). Upon consideration of the factors the Wisconsin Supreme Court has applied to determine whether liability should be denied for public policy reasons, the court concludes on the record now before it that Kia America's motion should be denied.

The injuries alleged are not too remote from the negligence and/or design defect alleged. The defect alleged is the failure to install anti-theft mechanisms or technology that would have made Kias more difficult to steal. According to the complaint, the NHTSA has concluded that

"stolen cars constitute a major hazard to life and limb on the highways." Compl. ¶ 20. It is not hard to see why. As the claims asserted by the individual plaintiffs in this case illustrate, stealing a car frequently leads to high-speed chases and fatal or near-fatal collisions as the car thieves attempt to evade arrest and apprehension for a serious crime. The failure to equip a particular make and model of car with the anti-theft mechanism and technology that is standard in other makes and models allegedly served as an open invitation to those willing to engage in such behavior and led to an epidemic of Kia thefts in the Milwaukee area.

Given the incidence of crime in many areas of the country, the court cannot say that it is too highly extraordinary that the alleged defect should have resulted in such harm. The injuries alleged are the type of injuries one could reasonably expect to result from the failure to use reasonable means to prevent auto theft, and allowing recovery would not place an unreasonable burden on an automobile manufacturer. Nor would allowing recovery open the way to fraudulent claims. Automobile collisions resulting in serious injuries are generally fully investigated and well documented. As to the last factor, allowing recovery would not enter a field that has no sensible or just stopping point. If the vehicles are found to have the defect alleged, eliminating that defect would stop such claims.

The court notes that Kia America is already defending against class actions brought by consumers who purchased Kias, municipalities (including Milwaukee) that suffered from the epidemic of Kia thefts over the last decade, and insurers who paid claims under their policies and are now pursuing property damage subrogation claims. *See In Re: Kia Hyundai Vehicle Theft Mkt., Sales Practices, & Prods. Liab. Litig.*, No. 8:22–ML–3052–JVS–KES (C.D. Cal.); *In Re Kia Hyundai Vehicle Theft Litig.* (the Insurer Suit), No. 8:22–ML–03052–JVS (KESX), 2023 WL 8126869, at *1 (C.D. Cal. Nov. 15, 2023); *In Re Kia Hyundai Vehicle Theft Litig.* (the Illinois

16

Suit), No. 8:22–ML–03052–JVS–KES, 2024 WL 3915166, at *1–2 (C.D. Cal. Aug. 14, 2024); *In Re Kia Hyundai Vehicle Theft Litig.* (the Ohio Suit), No. 8:22–ML–03052–JVS–KES, 2024 WL 4184059, at *1–2 (C.D. Cal. Sept. 6, 2024). It makes little sense to hold that public policy precludes the plaintiffs in this case who allegedly suffered serious bodily injuries from recovering but does not preclude other plaintiffs with only economic damages flowing from the same alleged defect to proceed.

## CONCLUSION

For these reasons, HATCI's motion to dismiss for lack of personal jurisdiction (Dkt. No. 9) is **GRANTED**. The clerk is directed to terminate HATCI as a defendant in this case. Kia America's motion to dismiss for failure to state a claim (Dkt. No. 7) is **DENIED**. The clerk is directed to place this matter on the court's calendar for a Rule 16 telephone scheduling conference.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of May, 2026.

William C. Griesbach
United States District Judge

17